***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby MODIFIES and AFFIRMS the Opinion and Award of Deputy Commissioner Glenn.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all time relevant to this matter, an employer-employee relationship existed between employee-plaintiff and employer-defendant, and employer-defendant was insured for workers' compensation benefits.
3. The date of the injury which is the subject of this claim is February 16, 2001.
4. Defendants filed a Form 60 admitting liability for plaintiff's injuries pursuant to N.C. Gen. Stat. § 97-82.
5. Plaintiff is currently employed and working for defendants on restricted duty.
6. The following exhibits were entered into the evidence of record at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit 1 — plaintiff's medical records
b. Stipulated Exhibit 2 — medical bills
c. Stipulated Exhibit 3 — Form 25Ps
d. Stipulated Exhibit 4 — Form 25Ts
e. Stipulated Exhibit 5 — Form 22
7. The issues to be determined by the Commission are whether plaintiff injured her neck when she fell at work on February 16, 2001 and suffered compensable injuries to other parts of her body, and what, if any, additional benefits is plaintiff entitled to receive under the North Carolina Worker' Compensation Act.
 ***********
Based upon all of the competent, credible evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff has been employed as a supervisor for the Families for Kids program through Lincoln County's Department of Social Services for over thirteen years.
2. On February 16, 2001, plaintiff sustained an injury by accident arising out of and in the course and scope of her employment with defendants when she fell from a chair while attempting to hang a poster on the reception area wall of her workplace.
3. On February 16, 2001, plaintiff presented to Lincoln Medical Center's Emergency Room where she was diagnosed with an acute fracture of the base of the fifth metarsal bone of the right foot and an acute fracture of the distal left radial metaphysis of the left wrist.
4. Plaintiff was treated by Dr. J. Emory Chapman, an orthopaedic specialist, who applied a molded short arm cast to plaintiff's left wrist and placed her in a walker boot for her injured right foot. Plaintiff was told to remain out of work until February 26, 2001.
5. Defendants accepted liability for plaintiff's accident pursuant to a Form 60 dated February 27, 2001.
6. On March 1, 2001, Dr. Chapman released plaintiff to work for four hours per day, but restricted her from driving.
7. On April 5, 2001, Dr. Chapman noted healing of both fractures and scheduled plaintiff to begin occupational therapy.
8. On May 10, 2001, Dr. Chapman noted that the wrist fracture had completely healed, but the foot fracture was still healing. He released plaintiff back to full duty work.
9. On June 14, 2001, Dr. Chapman stated that plaintiff should continue to improve and reach maximum medical improvement in approximately three months.
10. On July 12, 2001, Dr. Chapman noted that plaintiff's foot had completely healed and that she continued to experience residual stiffness in her hand, but released plaintiff at maximum medical improvement with a 0% permanent partial disability rating to her right foot and a 2% rating to her left hand.
11. On August 2, 2001, plaintiff returned to Dr. Chapman reporting pain in her left shoulder. Dr. Chapman noted "[a]t her initial evaluation, she was complaining of pain in her shoulder, but due to the other injuries of the other parts of her extremity, it was difficult to separate this out and examine it." Dr. Chapman suspected rotator cuff tendonitis, but ordered an MRI to rule out rotator cuff tear. Dr. Chapman directed plaintiff to continue full duty work.
12. On August 30, 2001, Dr. Chapman noted that the MRI performed on August 9, 2001 did not show rotator cuff tear, but that plaintiff suffered from AC arthropathy with rotator cuff tendonitis. Dr. Chapman ordered a corticosteroid injection and physical therapy.
13. On September 27, 2001, Dr. Chapman noted that plaintiff had no benefit from the injections and that she was not benefiting from physical therapy.
14. On October 25, 2001, Dr. Chapman recommended subacromial decompression and excision of the distal clavicle for plaintiff's ongoing shoulder pain. Dr. Chapman performed arthroscopic decompression and excision surgery on November 15, 2001.
15. On November 21, 2001, Dr. Chapman's partner, Dr. Gregory Hardigree, saw plaintiff in follow-up and noted plaintiff to have marked spasm of the trapezius and pain in her neck.
16. On November 27, 2001, Dr. Chapman referred plaintiff for physical therapy for her shoulder. He also diagnosed her with plantar fasciitis of the right foot which was due to alteration in gait as a result of the fracture. Plaintiff was restricted from driving and work for at least three weeks.
17. On December 3, 2001, plaintiff saw Dr. Chapman and reported shoulder soreness and pain in her neck. That same date plaintiff reported neck pain to the physical therapist.
18. On December 20, 2001, Dr. Chapman released plaintiff to drive and to return to work on December 27, 2001 with limited walking.
19. On January 29, 2002, plaintiff was seen by David Kirlin, a podiatrist, for heel pain. Dr. Kirlin prescribed various treatment modalities, including stretching and ice therapy, and ordered temporary foot orthoses.
20. After release by Dr. Chapman, plaintiff continued to experience pain with her left hand and left wrist and sought further medical treatment with Dr. John Gaul, an orthopaedic hand specialist, on February 12, 2002. Dr. Gaul's examination revealed limited range of motion in the left hand with positive Tinel's and pain over the A-1 pulley into her left middle finger with obvious popping. He referred plaintiff for physical therapy for her wrist and injected her middle finger with Kenalog, Xylocaine and Marcaine.
21. On February 21, 2002, plaintiff returned to Dr. Chapman for plantar fasciitis as a result of her earlier right foot fracture causing alteration in her gait. Dr. Chapman again concluded that plaintiff had reached maximum medical improvement for her shoulder and wrist, but not her foot.
22. On February 21, 2002, Dr. Chapman also assigned a 10% permanent partial disability rating to plaintiff's shoulder, a 5% rating to her left wrist and a 3% rating to her right foot. He placed plaintiff on permanent work restrictions including no lifting over 25 pounds and no repetitive work above shoulder level. Dr. Chapman then referred plaintiff to Dr. W. Hodges Davis, an orthopaedic foot expert, for further evaluation.
23. On March 19, 2002, plaintiff returned to Dr. Gaul reporting pain down her shoulder on the left side and down the back of her arm. Dr. Gaul noted plaintiff still had popping in the left hand and a positive speed test in her left shoulder. EMG/nerve conduction studies were negative. Dr. Gaul suspected shoulder bursitis and tendonitis and prescribed a Medrol dosepak. Dr. Gaul felt there was no question that plaintiff's bursitis, tendonitis, arthritis, and severe carpal tunnel sprain were related to her compensable injury by accident.
24. On April 2, 2002, plaintiff underwent evaluation by Dr. Hodges Davis on referral of Dr. Chapman for persistent pain on the plantar aspect of her right foot secondary to her other injuries sustained on February 16, 2001. Dr. Davis' exam revealed a tight Achilles tendon. Dr. Davis recommended a performance orthotic shoe.
25. On May 14, 2002, Dr. Davis noted that plaintiff continued to have right heel pain and pain over the lateral corner of her plantar fascia. He placed plaintiff in a boot for immobilization for 3-4 weeks. Dr. Davis further noted it was his opinion that her symptoms were related to her compensable injury by accident.
26. On June 11, 2002, Dr. Davis noted some improvement in plaintiff's symptoms and took her out of the boot and placed her back in an orthotic shoe.
27. On June 14, 2002, plaintiff filed a Form 33 Request for Hearing, based on defendants' refusal to pay for the medical treatment provided to plaintiff by Dr. Gaul and Dr. Davis.
28. On June 17, 2002, plaintiff reported to Dr. Anthony Wheeler on referral from Dr. Gaul for electrodiagnostic studies for her hand numbness.
29. On June 25, 2002, plaintiff returned to Dr. Gaul. Dr. Gaul's exam revealed a slightly positive Speeds test and slightly positive Tinel's test. He noted that the etiology for her discomfort was uncertain and recommended an MRI.
30. On June 29, 2002, MRIs of the cervical spine and left shoulder were performed which showed posterior midline annular tears and shallow protrusions at the C4-5, C5-6 and C6-7 disc with mild central canal stenosis and a partial intrasubstance tear of the left shoulder.
31. On July 10, 2002, Dr. Gaul noted scar tissue along the rotator cuff, consistent with bursitis in the left shoulder post rotator cuff repair, irritation of the median nerve and stenosing tenosynovitis of the long and ring fingers probably as a result of the direct blow to the concrete when she fell on the outstretched hand. He stated that plaintiff would gradually get better with time and recommended continuing rotator cuff strengthening exercises and pulley exercises. Dr. Gaul injected the subacromial space with Kenalog, Marcaine and Xylocaine, as well as injected the right finger A-1 pulley.
32. On July 26, 2002, plaintiff returned to Dr. Davis, who ordered a series of three Sonorex injections for her plantar fasciitis.
33. On September 3, 2002, Dr. Gaul prescribed Bextra for shoulder bicipital tendinitis/bursitis and trigger fingers. He restricted plaintiff's typing to no more than 15 minutes every hour. He noted that plaintiff may eventually need surgical treatment for trigger finger which appears to be getting worse.
34. On October 17, 2002, plaintiff returned to Dr. Wheeler with stiffness and impaired movement of the DIP-PIP joints of third through fifth digits of the left hand and impaired range of motion in the left wrist and left shoulder. Plaintiff's cervical spine MRI showed midline annular tears in the outer portion of the disc and shallow protrusions at C4-5, C5-6, and C6-7 disc levels with cord flattening. Dr. Wheeler concluded his participation from a treatment standpoint would be most appropriate after surgical therapy had been completed.
35. On October 22, 2002, Dr. Gaul stated that plaintiff would continue to experience some chronic pain. He ordered lab work to rule out rheumatological involvement. On December 2, 2002, Dr. Gaul referred plaintiff for further therapy to assist with weak abduction and limited internal rotation in the shoulder.
36. On December 11, 2002, plaintiff saw Dr. Wheeler for neck pain. Dr. Wheeler prescribed Pilates and noted that he might institute a therapy program for plaintiff after she completed treatment with Dr. Davis and Dr. Gaul.
37. On December 13, 2002, plaintiff returned to Dr. Davis after having completed the series of prescribed injections, noting some improvement in her toes, but continuing tenderness in her heel. Dr. Davis restricted plaintiff to limited duty work with limited walking and the ability to sit when needed.
38. On January 22, 2003, Dr. Davis ordered an MRI for ongoing tenderness over the tarsal tunnel with tunnel type symptoms.
39. On February 19, 2003, Dr. Davis documented plaintiff to have a positive Tinel's with palpation and ongoing tenderness and recommended that plaintiff undergo tarsal tunnel and plantar facial release.
40. On January 28, 2003, Dr. Gaul noted some improvement in plaintiff's shoulder symptoms. He injected a trigger point and recommended evaluation by a specialist for possible fibromyalgia.
41. On March 13, 2003, plaintiff underwent right complete tarsal tunnel release and plantar fascia release by Dr. Davis. Plaintiff was out of work and was on paid sick leave from March 13, 2003 until she returned to work on May 18, 2003.
42. On March 27, 2003, plaintiff saw Dr. Wheeler for surgical follow-up. Dr. Wheeler noted that plaintiff had been compliant with Pilates but had been unable to participate over the past few weeks following foot surgery.
43. On April 8, 2003, plaintiff underwent evaluation by Dr. Glenn McCain, a rheumatologist, at the referral of Dr. Gaul for the determination of a diagnosis of fibromyalgia. Dr. McCain noted no evidence of systemic fibromyalgia. Instead, he determined plaintiff had developed multiple areas of myofascial pain that are commonly seen after trauma and during periods of forced immobilization which plaintiff may have experienced with her fractures and frozen shoulder. Dr. McCain recommended trigger point injections, soft tissue therapy and medication therapy including Ultram and Ambien.
44. On July 17, 2003, Dr. Gaul testified that the symptoms plaintiff was experiencing in her left hand, wrist and shoulder and the treatment that he provided for those injuries were related to her work injury. Plaintiff experienced improvement in her symptoms with Dr. Gaul's medical treatment.
45. On July 24, 2003, plaintiff reported to Dr. Wheeler frustration over her job limitations and daily fatigue. Plaintiff also reported symptoms consistent with restless leg syndrome and cervical-trapezius myofascial dysfunction. Dr. Wheeler prescribed Wellbutrin for coping and depression and Klonopin for her restless leg syndrome. He also recommended physical therapy, including Pilates method exercise program, for the cervical-trapezius myofascial dysfunction.
46. On August 12, 2003, plaintiff returned to Dr. Gaul with some improvement. Dr. Gaul noted that plaintiff's primary problem was adhesive capsulitis of her shoulder. He recommended a second opinion by Dr. Robert McBride on whether plaintiff would benefit from manipulation and/or arthroscopy.
47. On August 19, 2003, plaintiff underwent evaluation by Dr. Robert McBride by referral of Dr. Gaul. Dr. McBride concurred with plaintiff's earlier diagnoses of adhesive capsulitis and rotator cuff syndrome of the left shoulder and recommended manipulation under anesthesia with steroid injection of the left shoulder and possible rotator cuff repair.
48. On September 4, 2003, Dr. Wheeler noted that plaintiff was experiencing some improvement in her fatigue with Wellbutrin, that her restless leg syndrome resolved on Klonopin and that she had some overall improvement in her pain symptoms with Pilates.
49. On September 12, 2003, Dr. Wheeler testified that the symptoms plaintiff was experiencing and the treatment that he provided was related to her work injury.
50. On October 13, 2003, Dr. Davis testified that plaintiff's plantar fasciitis and the surgery and treatment that she received for her plantar fasciitis were related to her work injury. Plaintiff experienced improvement in her foot symptoms with the treatment provided by Dr. Gaul.
51. The Full Commission finds based upon the greater weight of the medical evidence that plaintiff's neck condition was related to her compensable injury by accident.
52. Plaintiff incurred out-of-pocket medical expenses arising out of her treatment with Drs. Davis, Chapman, Wheeler and Gaul, including prescriptions, medical co-pays and travel.
53. Plaintiff's average weekly wage was $631.04 per week, yielding a compensation rate of $420.71.
54. As a result of the compensable injury by accident, plaintiff was unable to work in any employment as of her March 13, 2003 surgery by Dr. Davis until she returned to her regular job on May 18, 2003. Plaintiff took sick leave during this seven week period of disability. From May 19, 2003 and as of the Deputy Commissioner hearing, plaintiff continued to work for defendants.
55. Plaintiff has not yet reached maximum medical improvement from those injuries being treated by Dr. Gaul and Dr. Wheeler. On July 23, 2003, plaintiff reached maximum medical improvement for her right foot injury treated by Dr. Davis, but at the close of the evidentiary record had not been rated or issued restrictions by Dr. Davis.
56. Defendants have not defended this action without reasonable grounds.
 ***********
Based upon the foregoing stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained multiple injuries arising out of her compensable injury by accident on February 16, 2001, including injuries to her left hand and wrist, left shoulder, neck and right foot. N.C. Gen. Stat. § 97-2(6).
2. As the result of the compensable injury by accident, plaintiff was disabled from any employment and entitled to temporary total disability compensation at the rate of $420.71 per week for the period March 13, 2003 until May 18, 2003. N.C. Gen. Stat. § 97-29.
3. As the result of the compensable injury by accident, plaintiff retains a 5% permanent functional impairment to her left wrist for which she is entitled to permanent partial disability compensation for 10 weeks at the rate of $420.71 per week. N.C. Gen. Stat. § 97-31(12).
4. Plaintiff is entitled to have defendants pay for medical treatment incurred or to be incurred as a result of the compensable injury by accident. Medical treatment of plaintiff's right foot, left hand, left wrist, left shoulder and neck was necessary to effect a cure, give relief and tended to lessen plaintiff's period of disability. The approved medical care includes payment of plaintiff's treatment with Drs. Davis, Chapman, Gaul and Wheeler. N.C. Gen. Stat. § 97-25.
5. Plaintiff is entitled to reimbursement from defendants for all of her out-of-pocket medical expenses in the form of health insurance co-pays, prescriptions and travel, arising out of her related medical treatment with Drs. Davis, Chapman, Gaul and Wheeler, as well as the treatment and therapy they prescribed. N.C. Gen. Stat. § 97-25. Any past due out-of-pocket expenses shall be subject to a 10% penalty pursuant to N.C. Gen. Stat. §97-18.
6. The defense of this claim was reasonable and not stubborn, unfounded litigiousness, and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. §97-88.1. Sparks v. Mountain Breeze Restaurant, 55 N.C. App. 663,286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the rate of $420.71 per week for the period March 13, 2003 through May 18, 2003. This amount has accrued and shall be paid in a lump sum, subject to the attorney's fee awarded below.
2. Defendants shall pay to plaintiff permanent partial disability compensation at the rate of $420.71 per week for 10 weeks for the 5% permanent functional impairment to her left hand. This amount has accrued and shall be paid in a lump sum, subject to the attorney's fee awarded below.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury, including the payment of all remaining outstanding medical bills for treatment rendered by Drs. Davis, Chapman, Gaul and Wheeler.
4. Defendants shall reimburse plaintiff for all out-of-pocket expenses, including insurance co-pays, prescriptions and travel arising out of her treatment prescribed or provided by Drs. Davis, Gaul, Chapman and Wheeler. These out-of-pocket expenses are subject to a 10% penalty on all past-due amounts.
5. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of all compensation awarded plaintiff. This amount shall be paid directly to plaintiff's counsel.
6. The extent of plaintiff's permanent functional impairment, if any, to her right foot, left shoulder and neck is not a part of the evidence of record and, therefore, this Opinion and Award does not address those ratings. However, if in the future the parties are unable to reach an agreement regarding these issues, either party may request a hearing before the Commission.
7. Defendants shall pay the cost of this action.
This the ___ day of August, 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd